STEINMAN v. The CIRCASSIAN. See Case No. 2,724.

## Case No. 13,358.

### Ex parte STELL.

[4 Hughes, 157.]

Circuit Court, E. D. Virginia. 1882.

RAILROAD COMPANIES — NEGLIGENCE — CHILD ON TRACK — EQUIPMENT OF TRAIN — REMOTE AND PROXIMATE CAUSE—EQUITY—ISSUE FOR JURY.

[1. The rule requiring railroad companies to exercise the utmost care and diligence, applies, in the absence of statutory provisions, only in favor of passengers, and not to the case of a child trespassing upon the track. In the latter case, the company is required to do only what prudent owners of railroads are doing in respect to their trains and equipments. East Tennessee & G. R. Co. v. St. John, 5 Sneed, 526, distinguished.]

[2. An engineer running over a track which is clear for a long distance ahead is not prohibited by any rule of prudence or duty from taking his eyes off the track momentarily, to avoid being hit by the iron door of the furnace, which the fireman is just throwing open.]

[3. Where a child is run over upon the track, by a train having hand brakes only, which might have been stopped in time if fitted with air brakes, the failure to equip the road with air brakes is only a remote cause of the accident, the proximate cause being the child's coming upon the road helpless and unattended.]

[4. A petition against the receivers of a railroad to recover damages for causing the death of a child upon the track will not be referred to a jury when, upon the facts which are made to appear, the question of negligence is one of law, rather than of fact.]

On the petition of G. W. Stell, administrator of L. N. Stell, deceased, claiming $10,000 damages for death caused by a railroad train,

on his motion for a jury and issue out of chancery.

HUGHES, District Judge. The evidence submitted to me seems to show the following state of facts: The regular eastward-bound passenger train of the Atlantic, Mississippi and Ohio Railroad came to Ford's Depot on its schedule time, about one o'clock in the afternoon of the 6th July, 1877. The engineer, Robinson, in the few moments of stoppage, got down and oiled his engine, and then moved his train off eastward at the usual speed, going first down a grade of 27 feet per mile for some distance, to a switch, and then passing on upon a slightly ascending grade of 19 feet to the mile. The track was straight to, and for a considerable distance beyond, the place where the accident which is the subject of this suit occurred, which place was distant about a quarter of a mile from the depot. When the train got to the switch which has been mentioned, there was nothing on the track in sight ahead. Just there the fireman began to fire up, and the opening of the furnace door caused the engineer to look down for a moment, to avoid being struck by the heavy iron door. On looking up again, the engineer saw a child at a distance of some 450 feet ahead on the track. Then, he says in his evidence, "as quick as I could, I reversed the engine and blew the whistle, and did all in my power to stop the engine. When the engine did stop, I brought the reverse lines to the centre notch, so as to keep still in the event the child had not been struck." "I did not see anything on the track when I left the depot, though I saw some object a short time before when I was oiling up the engine." "The brakes had not been previously defective during the day, or afterwards." "They were the common hand-brake in use on all the railroads in Virginia that I had run on up to that time." The attempt of the engineer was ineffectual to check up his train in time, and the child was run over by the engine and part of the train, sustaining injuries which resulted in its death in a few hours.

The witness Williams says: "The train was right opposite my house when it first blew, and that is, I think, about one hundred and fifty yards from where the child was killed." "The second time the train blew, it was different from what I had ever heard it at that place before, and I then looked out and saw the child on the track." "I didn't see the killing exactly, because I turned my back when I saw that the train was going to run over the child." The testimony varies as to the distance from the Williams house to the place of the accident; but it is a liberal estimate to fix it at 450 feet. It is not denied or questioned that the engineer did all that could be done by him from the instant of seeing the child on the track, to prevent the accident. The wit-

nesses who were near by seemed to believe the accident to have been inevitable. One of them, Mr. Williams, turned his face away when he heard the whistle, and saw the position of the child. The testimony of the child's brother, Charles F. Stell, shows that the child could not have been on the track many moments before the accident, and would seem to support the engineer's statement that the track was clear at the moment when he looked down to avoid being struck by the furnace door. At the place of the accident the grade of the railroad was about two feet below the general surface of the ground. The child's parents lived nearly opposite. on the north side of the road, in a building situated about thirty yards distant. There was no fence between this dwelling and the railroad. There was at the place of the accident a ditch on the side of the road, across which was a crosstie serving as a pass-way. The child was about two years old, a little girl. No one was near or in charge of it when the accident happened. It had wandered from its parents' door to the railroad. The Westinghouse automatic continuous air-brake had not been adopted on the division of the A. M. & O. Railroad from Lynchburg to Norfolk, but had been adopted on the division west of Lynchburg. Negotiations had been made for putting it on the passenger trains of the eastern division, but it was not actually put on until some short time after the accident.

The letter of R. M. Sully, which is part of the evidence, gives the following results of experiments made with the Westinghouse air-brake, coupled with the remark that they were test trials, probably made under very different conditions from any likely to be obtained in the ordinary routine of railway operations, in which the brakes were carefully adjusted for specific tests, and doubtless applied to the driving wheels of the locomotive as well as to every car wheel in the train: At Chicago, train moving at 32 miles an hour, stopped in 350 feet. At Chicago, train moving at 40 miles an hour, stopped in 370 feet. On Kansas Pacific, train moving 40 miles an hour, stopped in 250 feet. On Penna. Railway, train moving 30 miles an hour, stopped in 420 feet. Mr. Sully adds the remark that his own experience is that no such results can be obtained in the actual working of any railroad. He mentions the case of accident on his own (the Petersburg) railroad, where a passenger train with the Westinghouse brake upon it ran over a tramp lying on the track, and checked up in a space of 500 feet after the most prompt and energetic action of the engineer. Mr. Fink, one of the receivers of the A. M. & O. Railway, on which this accident occurred, says, on the subject of brakes: "When the receivers took charge of the A. M. & O. R. R., in June, 1876, the continuous power brakes then in use were known to be imperfect, and improvements were made looking to their improvement. It is true that the ordinary Westinghouse air-brake had then been adopted by several roads in this country; but it is admitted that the use of this brake, and in fact the use of any brake which is not automatic in its action, involves in the long run serious disaster; and I myself prefer the ordinary hand-brake to this form of brake, because 1 consider it safer in the long run." "It was with the view of adopting the best form of brake (the most reliable brake under all circumstances) that the receivers delayed the introduction of the continuous power brake on the A. M. & O. Railroad. They adopted the Westinghouse automatic air-brake just as soon as they were satisfied that the improvements in the form of brake had arrived at a state which justified the abandonment of the ordinary hand-brake and the adoption of the continuous power brake." "I may state that there are many roads in this country, some of them wealthy corporations (the New York Central & Hudson River Railway, for one), which have as yet not adopted the continuous power brake; while in England the so-called 'battle of brakes' is still going on."

Such, I think, are the facts which determine this case; and I have no reason to suppose that they would be changed by any evidence likely to be placed before a jury. The case is before me on a motion for an issue out of chancery. I am now to pass only on the question of negligence,—whether or not there was negligence, and whether this is a question of law for the court or of fact for a jury. The question of damages would be an after consideration.

This is not a suit by a passenger against a railroad company, for negligence in managing its train, from which the passenger claims damages for injuries sustained. The obligations of a railroad company to its passengers are such as to exact of its agents the utmost care and caution. But the present is the case of a trespasser upon the property of a railroad company claiming damages for injuries caused by the alleged negligence of the managers of the road in running a train over the trespasser. In such a case, only such care and caution are required as a prudent man would exercise in the emergency in which the injury was sustained. True, the engineer was bound to do all that was possible to be done in immediate connection with the accident to prevent injury to the trespasser. But his employers are not responsible to the trespasser for any remote, anterior causes to which the accident might be traced, if they shall have done, in respect to them, what prudent owners of railroads should do in equipping and running their trains. What the law might exact of them in respect to passengers does not furnish the standard of duty by which their obligation to the general public is determined. As to the general public, they are only required to do what prudent owners of railroads are doing in respect to their trains

and their equipments. It is true that in Tennessee and probably other states the utmost care and caution is required of railroad managers, as well towards the general public, as towards passengers; but this is only by virtue of express statute. It was on this statutory provision that the supreme court of Tennessee based its decision in the case of East Tennessee & G. R. Co. v. St. John, 5 Sneed, 526, cited by plaintiff's counsel. In Virginia there is no such statutory provision, and the standard of ordinary prudence and care is that which regulates the responsibility of railroad managers to the public at large.

The child which was killed in this case having been a trespasser, it is incumbent upon petitioner to overcome the presumption of law in favor of the defendants, that there was no negligence on the part of the engineer, and to show affirmatively that such care and caution as a prudent man would have observed was wanting on the part of the defendants, and of the engineer in charge of the train. It is not denied that the engineer, Robinson, did everything that was possible to save the child from the moment he saw it on the track.

. But the petitioner complains that there was fault on the part of the defendants in two respects:

(1) He charges that the engineer was in fault in taking his eyes off the track to avoid being struck by the iron door of the furnace just before seeing the child. The simple question on this point is, whether a prudent engineer, running over a track that was clear for a long distance before him, was prohibited by any rule of prudence or duty, by taking his eyes a moment from the road, from saving himself by what was probably an involuntary impulse from a threatening personal injury. This is a question of law, more than of fact; and I cannot think that any chancellor would need the advice of a jury, or consent to be controlled by it on such a question.

(2) The plaintiff also charges that the receivers were in fault in not having provided the Westinghouse air-brake for their passenger trains before the time of this accident. It is by no means certain that this brake could have changed the result, even if it had been in use on this occasion. The testimony and opinion of an expert, Mr. Sully, seem to show that it could not, and the presumption that it would is rather violent. But assuming that this brake might have helped to avoid the accident, and that its not having been put on the train was an act of negligence, yet such an act of omission was but a remote cause of the accident. if cause at all. The immediate cause was the child's coming on the road unattended, helpless and unconscious of danger, just at the time the train was due and approaching with the usual noise produced by its rapid motion. In the recent case of the Richmond & D. R. Co. v. Anderson, 31 Grat. 812, the court of appeals of Virginia cite and quote as law Trow v. Vermont Cent. R. Co., 24 Vt. 487, where the supreme court of Vermont say: "Where the negligence of the plaintiff is proximate, and that of the defendant is remote, or consisting of some other matter than what occurred at the time of the injury, in such case no action can be maintained, for the reason that the immediate cause was the act of the plaintiff." This is emphatically the case in respect to a trespasser on a railroad, for, in respect to him, the company, provided it has used ordinary care, is under no obligation as to the general manner of equipping its property and running its trains, and is only bound, when an accident becomes imminent, to do all in its power to avoid injuring the trespasser at that particular time. A great number of cases might be cited, beginning with Davies v. Mann (better known as the "Donkey Case," decided in the English court of exchequer), 10 Mees. & W. 546, and embracing numerous English and American decisions, in which it has been expressly or impliedly held that, where injuries are inflicted by railroad companies or defendants in like relations to the public upon trespassers upon their roads, they are only responsible for acts of negligence which are immediately connected with the accidents from which the injuries result. But, even if such were not the law, I still do not see that enough of doubt is left by the evidence in this case to justify my sending the question of negligence to a jury.

It is settled that, at least as to passengers, railroad companies are bound to supply themselves with the best machinery and implements available for running their roads; and I have no doubt that, if a company should neglect to do so for so long a time, and in such a manner as to establish the presumption of indifference to their obligations in this respect, a court would hold them responsible, certainly to passengers, for injuries resulting from such laggardness or penuriousness. But in the present case it is shown that the continuous brakes in use previously to Westinghouse's latest improvement were defective; that the Westinghouse brake had but shortly before been brought to such perfection as to secure the confidence of the receivers of the Atlantic, Mississippi and Ohio Railroad; and that, having recently become satisfied of its safety and efficiency, the receivers had adopted it on the division of their road west of Lynchburg at the time of this accident, and were then preparing to place it upon the passenger trains of the eastern divisions. There can be no just inference from these facts of indifference to or neglect of duty in respect to brakes on the part of these receivers. I am not disposed to deny to men charged with the large interests and grave responsibilities of these receivers the exercise of such cautious and judicious discretion as becomes and justly belongs to them, in adopting so very important an appliance of railroad trains as these brakes are; nor do I

think a court or a jury is as competent to determine what brakes are the safest for railroad trains, or at what time it is prudent to adopt them, as professional railroad men having the largest experience and fullest information on the whole subject. Nothing is shown by the evidence before me, and I am persuaded that nothing can be shown, tending to establish the conviction that these receivers failed to employ the special knowledge possessed by them as railroad experts, and to exercise the discretion imposed upon them by their relations to the public in a thoroughly conscientious manner. On neither of the grounds, therefore, on which the petitioner claims a jury in this case, do I think he is entitled to such a reference as to the question of negligence.

The evidence submitted presents pure questions of law, and the principles of law governing the case as arising upon the evidence before me are such that it would be difficult for any additional evidence likely to be attainable by the petitioner to vary them. The principles on which the present motion for a jury depends are identical with those which have been passed upon by the courts in several prominent cases. One of these is Herring v. Wilmington & R. R. Co., 10 Ired. 402, where the court say: "What amounts to negligence is a question of law. * * * The cars were running at the usual hour, and at the usual speed; not through a village, or over a crossing place, or turning a point; but upon a straight line where they could have been seen for more than a mile. * * * There is no evidence that the engineer was not in his place and on the lookout. It (i. e. negligence on his post) cannot be inferred from the fact that he made no effort to stop until he got within 25 or 30 yards of the negroes (who were run over), for that is entirely consistent with the supposition that he had seen them for half a mile," etc., etc. Such was the character of the facts of a case in which the question of negligence arising upon them was held to be a question of law. It is true that there are many decisions in the reports in which a contrary ruling has been made; but there are two very recent cases in which the decisions were rendered by courts which establish the law for all courts in this state. The first of these is the recent case, cited already in another connection, of the Richmond & D. R. Co. v. Anderson, 31 Grat. 812, in which the question of negligence depended upon evidence very similar to and principles precisely the same as in the one at bar, and in which the Virginia court of appeals, on a demurrer to evidence, took the case from the decision of the jury, held the question to be one of law for the court, and ruled accordingly  The other case to which I allude was that of Railroad Co. v. Jones, 95 U. S. 443, where the supreme court of the United States say upon a view of the facts set out in the record (facts similar in the principles of law involved to those in the present case): "The plaintiff was not entitled to recover. * * * If the company (defendant below) had prayed the court to direct the jury to return a verdict for the defendant, it would have been the duty of the court to give such direction, and error to refuse"; thus holding that it was error to turn over to a jury the decision of the question of negligence arising upon the evidence, but should have decided that question itself. The motion now before me is settled by the two last cases cited, and is overruled.

A copy.
    Teste.      M. F. Pleasants, Clerk.